Defendant Christian Television Corporation of Alabama ("CTC") appeals from a summary judgment in favor of the plaintiffs, RCH Broadcasting, Inc. ("RCH"), and R.C. Hilton. Plaintiff RCH cross-appeals from a summary judgment in favor of CTC and defendant Robert D'Andrea. We affirm in part, reverse in part, and remand with instructions.
 ISSUES
The issues are (I) whether defendants CTC and D'Andrea are barred by the doctrine of collateral estoppel from the assertion of claims against the plaintiffs for breach of warranty and fraud; (II) whether there was a genuine issue as to any material fact concerning whether defendant D'Andrea personally guaranteed the purchase price of a television station to plaintiff RCH; (III) whether defendant CTC is entitled to an accounting for payments made to the plaintiff RCH; and (IV) whether the attorney fees awarded to plaintiff RCH were "reasonable."
 FACTS
RCH is an Alabama corporation, doing business in Florida; R.C. Hilton is its sole stockholder. RCH operated a television station in Opelika, Alabama. CTC is an Alabama non-profit corporation engaged in broadcasting religious television programming; Robert D'Andrea is its president. D'Andrea operated several other religious television stations and entered into negotiations with Hilton to purchase the Opelika station. D'Andrea visited the station on at least two occasions before purchasing it from RCH. On June 14, 1984, D'Andrea applied for an assignment of the Federal Communications Commission ("FCC") broadcasting license, which had been issued to RCH. On the same day, RCH and D'Andrea signed an asset purchase agreement ("agreement") for the sale of the station for a purchase price of $2,440,000. RCH sold and assigned all the fixed, tangible, and intangible assets, both real and personal property, including all the contracts, agreements, leases, licenses, permits, and equipment used in the operation of the station. D'Andrea subsequently assigned his rights under the agreement to CTC. As payment, CTC gave RCH three promissory notes, which were payable as follows:
 1. A $367,000 non-interest bearing note, payable in monthly installments of $10,000 each. If D'Andrea had to pay any of RCH's debts (RCH was in financial trouble at the time), between the execution of the agreement and the closing date, that payment was to be deducted from the $367,000 note.
 2. A $170,000 interest bearing note, payable in interest-only installments beginning 91 days after closing. The payments were based on 6% per annum interest to the 12th month and 12% thereafter. The principal was due in 5 years, with CTC having the option to extend for 5 more years.
 3. A $1,903,000 interest bearing note, payable on the same terms as the $170,000 note.
A list of RCH's debts, creditors, and inventory of equipment was provided to D'Andrea. The agreement required RCH to deliver to the buyer clear title to all its assets at closing, and stated that the equipment *Page 991 
would be in "good operating condition" at closing. The agreement provided that D'Andrea could assign the agreement and be relieved of personal liability. CTC made some initial payments on the notes to RCH and also made certain payments to RCH's creditors.
CTC later ceased making payments to RCH because it claimed that RCH had breached the agreement. RCH was subjected to a garnishment obtained on a $269,429.92 judgment entered on January 18, 1985, by the United States District Court for the Middle District of Alabama in a civil action brought by Paramount Television Domestic Distribution, Inc., against RCH. CTC was named by Paramount as garnishee in that action. The garnishment attached the payments that CTC was to make to RCH under the three promissory notes. In its answer and briefs filed in its defense of the garnishment action, CTC claimed that it was not indebted to RCH, because RCH had breached the agreement, specifically, (1) that RCH had made material misrepresentations as to the condition of the equipment; (2) that RCH had made misrepresentations as to the absence of liens on the assets; and (3) that CTC had had to pay certain debts of RCH in order to operate the equipment. After permitting limited discovery on the issue of "present indebtedness," the United States District Court held a hearing on Paramount's motion for judgment against garnishee CTC. The court stated in its order:
 "D'Andrea . . . admitted that the interest payments are due and owing. . . . D'Andrea argued for the first time . . . that his company had failed to make the interest payments because collateral securing the notes was defective. He agreed that the sole issue before the court was whether there is a factual basis for finding the collateral defective and classifying the debt as 'contingent.'
 "The court concludes that no such factual basis exists. D'Andrea alleged that the collateral was defective only after he was called to testify before this court. He never mentioned this reason for nonpayment to RCH Broadcasting, the company to whom the debt was owed; nor did he interpose this excuse at his deposition. Moreover, at the hearing before this Court, D'Andrea failed to produce a single piece of documentation or a single witness to support his claims that such defects do in fact exist. The court therefore finds D'Andrea's testimony to lack creditability."
The court entered judgment against the garnishee CTC and in favor of Paramount in the amount of $284,575.92.
In January 1987, RCH and Hilton sued CTC and D'Andrea in Montgomery Circuit Court and claimed damages (1) that arose out of the promissory notes; (2) for breach of contract; (3) for breach of a guaranty; (4) for fraudulent misrepresentation; (5) for reckless misrepresentation; and (6) for mistaken misrepresentation. CTC's and D'Andrea's answers to the complaint alleged failure of consideration; fraud in the inducement; lack of jurisdiction; and improper venue. CTC also filed a counterclaim against RCH and Hilton, claiming (1) that RCH had breached the warranties of sale because the assets were subject to liens and encumbrances; (2) that Hilton had failed to disclose to CTC that he had a security interest in the assets; (3) that RCH and Hilton had fraudulently misrepresented that the assets were free and clear of liens and encumbrances; (4) that Hilton had subordinated his claim to the assets to Paramount;[1] and (5) that RCH and Hilton had fraudulently induced D'Andrea to purchase the assets by fraudulently misrepresenting that the assets were free and clear of liens and encumbrances.
The parties filed cross-motions for summary judgment. In July 1988, the circuit court entered the following summary judgment:
 "1. Judgment is entered in favor of Christian [(CTC)] and D'Andrea and against Hilton, and Hilton's claims are dismissed. *Page 992 
 "2. Judgment is entered in favor of D'Andrea and Christian and against RCH on Counts II, III, IV, V, and VI.
 "3. Judgment is entered in favor of RCH and against Christian on Count I of the complaint in the amount of Three Million, Eight Hundred Fifty-Two Thousand, Thirty-One Dollars and Ninety-five Cents ($3,852,031.95), representing the principal due on each promissory note, interest at the rate stated in each note to the date of this judgment, and a reasonable attorney's fee in the amount of 15% of each note.
 "4. Judgment is entered in favor of RCH and Hilton and against D'Andrea and Christian on the counterclaim filed by D'Andrea and Christian, and the counterclaim is dismissed."
These appeals followed those judgments.
 I.
RCH argues that the doctrine of collateral estoppel barred CTC and D'Andrea from the relitigation of their fraud and breach of warranty claims. We agree. This Court has stated:
 " 'Collateral estoppel operates where the subsequent suit between the same parties is not on the same cause of action. Requirements for collateral estoppel to operate are (1) issue identical to one involved in previous suit; (2) issue actually litigated in prior action; and (3) resolution of the issue was necessary to the prior judgment. If these elements are present, the prior judgment is conclusive as to those issues actually determined in the prior suit.' "
Leverette v. Leverette, 479 So.2d 1229, 1235 (Ala. 1985) (quoting Wheeler v. First Alabama Bank of Birmingham,364 So.2d 1190, 1199 (Ala. 1978)). (Citations omitted.)
Furthermore, we find the following analysis persuasive:
 "[A]n 'issue' is a 'single, certain and material point arising out of the allegations and contentions of the parties.'
 "A new contention is not, however, necessarily a new issue. If a new legal theory or factual assertion put forward in the second action is 'related to the subject-matter and relevant to the issues' that were litigated and adjudicated previously, 'so that it could have been raised, the judgment is conclusive on it despite the fact that it was not in fact expressly pleaded or otherwise urged.' The analogy to the rule against splitting a single cause of action is striking. Like a cause of action, 'an issue may not be . . . split into pieces. If it has been determined in a former action, it is binding notwithstanding the parties litigant may have omitted to urge for or against it matters which, if urged, would have produced an opposite result.' Any contention that is necessarily inconsistent with a prior adjudication of a material and litigated issue, then, is subsumed in that issue and precluded by the prior judgment's collateral estoppel effect."
Moore's Federal Practice, § 0.443[2] at 760-61 (2d ed. 1978).
Here, the validity of the promissory notes and CTC's obligations thereunder was determined by the United States District Court in the garnishment proceeding, to which RCH and CTC were parties. That court determined that the "debt" was not "contingent" and that CTC's claim that it was not liable on the notes because the collateral was defective had no "factual basis"; therefore, CTC was found liable on the notes. CTC and D'Andrea raised the same issues (fraud and breach of warranty) in the federal garnishment action as they now raise in the answers and counterclaims in this state action. CTC had sufficient incentive to fully present all potential defenses to the notes in the garnishment proceeding. These identical issues were actually litigated in the United States District Court, and the resolution of these issues was necessary for that court to find CTC liable on the notes and for it to order a garnishment of the payments owed by CTC to RCH. We conclude that the prior judgment of garnishment against CTC is conclusive as to the issue of whether it is liable to RCH on the three notes in this action.
 II.
RCH argues that the court erred in granting summary judgment for CTC and *Page 993 
D'Andrea on RCH's breach of contract and guaranty claims. By these claims, RCH argues that D'Andrea was personally liable for the total purchase price to RCH. There was not a scintilla of evidence to create a genuine issue as to any material fact regarding whether D'Andrea was personally liable to RCH. In fact, D'Andrea assigned all his rights in the agreement to CTC, including the rights in the FCC license, for which he applied individually. RCH accepted payments pursuant to the agreement from CTC and conveyed the assets to CTC. RCH's argument that D'Andrea is personally liable for the purchase price because he orally agreed to guarantee the purchase price is without merit. Code 1975, § 8-9-2(3) (the Statute of Frauds), provides as follows:
 "In the following cases, every agreement is void unless such agreement or some note or memorandum thereof expressing the consideration is in writing and subscribed by the party to be charged therewith or some other person by him thereunto lawfully authorized in writing:
". . . .
 "(3) Every special promise to answer for the debt, default or miscarriage of another."
In order to determine if an agreement is within § 8-9-2(3), it must first be determined if an agreement is "collateral" or "original" in nature. Fendley v. Dozier Hardware Co.,449 So.2d 1236 (Ala. 1984); Herrington v. Central Soya Co., 420 So.2d 1
(Ala. 1982). " 'Collateral' agreements are those in which the object of the promise is to become the guarantor of another's debt; these are within the statute and must be in writing to be enforceable." Fendley, supra, at 1238 (quoting Herrington,supra, at 3). " 'Original' agreements are those in which the effect of the promise is to pay the debt of another, but the object of the promise is to promote some purpose of the promisor." Fendley, supra, at 1238 (quoting Herrington,supra, at 3). Another test for determining which promises are within the Statute of Frauds is set out in Fendley, supra, at 1238 (quoting Boykin McRae v. Dohlonde Co., 37 Ala. 577,582 (1861)):
 "When, therefore, an action is brought against one charging him with the value of goods delivered to another, and on his promise to pay; and it is set up in defense, that the promise was to pay the debt of another, and was not in writing, the decisive question is, to whom was the credit given.
If the credit was given solely to the defendant — that is, if the goods were really sold to him, though delivered to another — the statute is then out of the case. But, if the whole credit was not given to the defendant — that is to say, if any credit at all was given to the party receiving the goods — the promise of the defendant is collateral, and within the statute. . . ."
The evidence in this case indicates that the "whole credit" was not given to D'Andrea and that CTC received at least some credit under the Boykin test, supra. We conclude that any promise that D'Andrea made was "collateral" and was within the Statute of Frauds. Therefore, any agreement for D'Andrea to personally guarantee the purchase price must be in writing to be enforceable. RCH argues that the following language in the application to assign the FCC license from RCH to D'Andrea is sufficient to establish a writing:
 "The applicant [(D'Andrea)] certifies that: (a) it has a reasonable assurance of a present firm intention for each agreement to furnish capital or purchase capital stock by parties to the application, each loan by banks, financial institutions or others, and each purchase of equipment on credit; (b) it can and will meet all contractual requirements as to collateral, guarantees, and capital investment; (c) it has determined that all such sources (excluding banks, financial institutions and equipment manufacturers) have sufficient net liquid assets to meet these commitments."
We conclude that this evidence is insufficient to establish that D'Andrea personally guaranteed the purchase price to RCH. Therefore, summary judgment for CTC and D'Andrea on these claims was proper. *Page 994 
 III.
CTC argues that it made certain payments on RCH debts and obligations that should be credited to its favor on the principal amount owed to RCH. We conclude that the record provides a scintilla of evidence creating a genuine issue of material fact as to whether such payments were, in fact, made and credited to CTC's debt. Therefore, we reverse the money judgment against CTC and remand this cause to the circuit court for an accounting and such other proceedings as may be necessary, not inconsistent with this opinion.
 IV.
CTC urges this Court to examine whether the circuit court's order of attorney fees for RCH in the amount of 15% of each note is an award of a "reasonable attorney's fee." Each note provided for the payment by CTC of a "reasonable attorney's fee" as part of the collection cost. There was no evidence presented in the record as to the reasonableness of the amount of the attorney fees that were due. Therefore, we remand this cause for a determination of the reasonableness of the attorney fees, under the standards set forth in Peebles v. Miley,439 So.2d 137 (Ala. 1983).
Therefore, the judgment is affirmed in part, reversed in part, and the cause is hereby remanded for further proceedings consistent with this opinion.
88-374 AFFIRMED IN PART; REVERSED IN PART; AND REMANDED WITH INSTRUCTIONS.
88-412 AFFIRMED.
HORNSBY, C.J., and JONES, SHORES and HOUSTON, JJ., concur.
[1] CTC has apparently abandoned this claim on appeal; it makes no argument regarding it in its briefs.