Justice THOMAS, dissenting.
"[F]ew devices could be better designed to exacerbate racial tensions than the consciously segregated districting system currently being constructed in the name of the Voting Rights Act." Holder v. Hall,512 U.S. 874, 907, 114 S.Ct. 2581, 129 L.Ed.2d 687 (1994)(THOMAS, J., concurring in judgment). These consolidated cases are yet another installment in the "disastrous misadventure" of this Court's voting rights jurisprudence. Id., at 893, 114 S.Ct. 2581. We have somehow arrived at a place where the parties agree that Alabama's legislative districts should be fine-tuned to achieve some "optimal" result with respect to black voting power; the only disagreement is about what percentageof blacks should be placed in those optimized districts. This is nothing more than a fight over the "best" racial quota.
I join Justice SCALIA's dissent. I write only to point out that, as this case painfully illustrates, our jurisprudence in this area continues to be infected with error.
I
The Alabama Legislature faced a difficult situation in its 2010 redistricting efforts. It began with racially segregated district maps that were inherited from previous decades. The maps produced by the 2001 redistricting contained 27 majority-black House districts and 8 majority-black Senate districts-both at the time they *1282 were drawn, App. to Juris. Statement 47-48, and at the time of the 2010 Census, App. 103-108. Many of these majority-black districts were over 70% black when they were drawn in 2001, and even more were over 60% black. App. to Juris. Statement 47-48. Even after the 2010 Census, the population remained above 60% black in the majority of districts. App. 103-108.
Under the 2006 amendments to § 5 of the Voting Rights Act of 1965, Alabama was also under a federal command to avoid drawing new districts that would "have the effect of diminishing the ability" of black voters "to elect their preferred candidates of choice." 52 U.S.C. § 10304(b). To comply with § 5, the legislature adopted a policy of maintaining the same percentage of black voters within each of those districts as existed in the 2001 plans. See ante,at 1270 - 1271. This, the districting committee thought, would preserve the ability of black voters to elect the same number of preferred candidates. App. to Juris. Statement 174-175. The Department of Justice (DOJ) apparently agreed. Acting under its authority to administer § 5 of the Voting Rights Act, the DOJ precleared Alabama's plans.[1]Id.,at 9.
Appellants-including the Alabama Legislative Black Caucus and the Alabama Democratic Conference-saw matters differently. They sued Alabama, and on appeal they argue that the State's redistricting plans are racially gerrymandered because many districts are highly packed with black voters. According to appellants, black voters would have more voting power if they were spread over more districts rather than concentrated in the same number of districts as in previous decades. The DOJ has entered the fray in support of appellants, arguing that the State's redistricting maps fail strict scrutiny because the State focused too heavily on a single racial characteristic-the number of black voters in majority-minority districts-which potentially resulted in impermissible packing of black voters.
Like the DOJ, today's majority sides with appellants, faulting Alabama for choosing the wrong percentage of blacks in the State's majority-black districts, or at least for arriving at that percentage using the wrong reasoning. In doing so, the Court-along with appellants and the DOJ-exacerbates a problem many years in the making. It seems fitting, then, to trace that history here. The practice of creating highly packed-"safe"-majority-minority districts is the product of our erroneous jurisprudence, which created a system that forces States to segregate voters into districts based on the color of their skin. Alabama's current legislative districts have their genesis in the "max-black" policy that the DOJ itself applied to § 5 throughout the 1990's and early 2000's. The 2006 amendments to § 5 then effectively locked in place Alabama's max-black districts that were established during the 1990's and 2000's. These three problems-a jurisprudence requiring segregated districts, the distortion created by the DOJ's max-black policy, and the ossifying effects of the 2006 amendments-are the *1283 primary culprits in this case, not Alabama's redistricting policy. Nor does this Court have clean hands.
II
This Court created the current system of race-based redistricting by adopting expansive readings of § 2 and § 5 of the Voting Rights Act. Both § 2 and § 5 prohibit States from implementing voting laws that "den[y] or abridg[e] the right to vote on account of race or color." §§ 10304(a), 10301(a). But both provisions extend to only certain types of voting laws: any "voting qualification or prerequisite to voting, or standard, practice, or procedure." Ibid.As I have previously explained, the terms " 'standard, practice, or procedure' ... refer only to practices that affect minority citizens' access to the ballot," such as literacy tests. Holder,512 U.S. at 914, 114 S.Ct. 2581(opinion concurring in judgment). They do not apply to "[d]istricting systems and electoral mechanisms that may affect the 'weight' given to a ballot duly cast and counted." Ibid.Yet this Court has adopted far-reaching interpretations of both provisions, holding that they encompass legislative redistricting and other actions that might "dilute" the strength of minority votes. See generally Thornburg v. Gingles,478 U.S. 30, 106 S.Ct. 2752, 92 L.Ed.2d 25 (1986)(§ 2 "vote dilution" challenge to legislative districting plan); see also Allen v. State Bd. of Elections,393 U.S. 544, 583-587, 89 S.Ct. 817, 22 L.Ed.2d 1 (1969)(Harlan, J., concurring in part and dissenting in part).
The Court's interpretation of § 2 and § 5 have resulted in challenge after challenge to the drawing of voting districts. See, e.g., Bartlett v. Strickland,556 U.S. 1, 129 S.Ct. 1231, 173 L.Ed.2d 173 (2009); League of United Latin American Citizens v. Perry,548 U.S. 399, 126 S.Ct. 2594, 165 L.Ed.2d 609 (2006); Georgia v. Ashcroft,539 U.S. 461, 123 S.Ct. 2498, 156 L.Ed.2d 428 (2003); Reno v. Bossier Parish School Bd.,528 U.S. 320, 120 S.Ct. 866, 145 L.Ed.2d 845 (2000)(Bossier II ); Hunt v. Cromartie,526 U.S. 541, 119 S.Ct. 1545, 143 L.Ed.2d 731 (1999); Reno v. Bossier Parish School Bd.,520 U.S. 471, 117 S.Ct. 1491, 137 L.Ed.2d 730 (1997)(Bossier I ); Bush v. Vera,517 U.S. 952, 116 S.Ct. 1941, 135 L.Ed.2d 248 (1996); Shaw v. Hunt,517 U.S. 899, 116 S.Ct. 1894, 135 L.Ed.2d 207 (1996)(Shaw II ); Miller v. Johnson,515 U.S. 900, 115 S.Ct. 2475, 132 L.Ed.2d 762 (1995); United States v. Hays,515 U.S. 737, 115 S.Ct. 2431, 132 L.Ed.2d 635 (1995); Holder, supra; Johnson v. De Grandy,512 U.S. 997, 114 S.Ct. 2647, 129 L.Ed.2d 775 (1994); Growe v. Emison,507 U.S. 25, 113 S.Ct. 1075, 122 L.Ed.2d 388 (1993); Shaw v. Reno,509 U.S. 630, 113 S.Ct. 2816, 125 L.Ed.2d 511 (1993)(Shaw I ); Voinovich v. Quilter,507 U.S. 146, 113 S.Ct. 1149, 122 L.Ed.2d 500 (1993).
The consequences have been as predictable and as they are unfortunate. In pursuing "undiluted" or maximized minority voting power, "we have devised a remedial mechanism that encourages federal courts to segregate voters into racially designated districts to ensure minority electoral success." Holder, supra,at 892, 114 S.Ct. 2581(THOMAS, J., concurring in judgment). Section 5, the provision at issue here, has been applied to require States that redistrict to maintain the number of pre-existing majority-minority districts, in which minority voters make up a large enough portion of the population to be able to elect their candidate of choice. See, e.g., Miller, supra,at 923-927, 115 S.Ct. 2475(rejecting the DOJ's policy of requiring States to increase the number of majority-black districts because maintaining the same number of majority-black districts would not violate § 5).
*1284 In order to maintain these "racially 'safe burroughs,' " States or courts must perpetually "divid[e] the country into electoral districts along racial lines-an enterprise of segregating the races into political homelands." Holder, supra,at 905, 114 S.Ct. 2581(opinion of THOMAS, J.) (internal quotation marks omitted). The assumptions underlying this practice of creating and maintaining "safe minority districts"-"that members of [a] racial group must think alike and that their interests are so distinct that they must be provided a separate body of representatives"-remain "repugnant to any nation that strives for the ideal of a color-blind Constitution." Id.,at 905-906, 114 S.Ct. 2581. And, as predicted, the States' compliance efforts have "embroil[ed] the courts in a lengthy process of attempting to undo, or at least to minimize, the damage wrought by the system we created." Id.,at 905, 114 S.Ct. 2581.It is this fateful system that has produced these cases.
III
A
In tandem with our flawed jurisprudence, the DOJ has played a significant role in creating Alabama's current redistricting problem. It did so by enforcing § 5 in a manner that required States, including Alabama, to create supermajority-black voting districts or face denial of pre-clearance.
The details of this so-called "max-black" policy were highlighted in federal court during Georgia's 1991 congressional redistricting. See Johnson v. Miller,864 F.Supp. 1354, 1360-1361 (S.D.Ga.1994). On behalf of the Black Caucus of the Georgia General Assembly, the American Civil Liberties Union (ACLU) submitted a redistricting proposal to the Georgia Legislature that became known as the "max-black plan." Id.,at 1360. The ACLU's map created two new "black" districts and "further maximized black voting strength by pushing the percentage of black voters within its majority-black districts as high as possible." Id.,at 1361(internal quotation marks omitted).
The DOJ denied several of Georgia's proposals on the ground that they did not include enough majority-black districts. Id.,at 1366. The plan it finally approved was substantially similar to the ACLU's max-black proposal, id.,at 1364-1366, creating three majority-black districts, with total black populations of 56.63%, 62.27%, and 64.07%, id.,at 1366, and n. 12.[2]
Georgia was not the only State subject to the DOJ's maximization policy. North Carolina, for example, submitted a congressional redistricting plan after the 1990 Census, but the DOJ rejected it because it did not create a new majority-minority district, and thus "appear[ed] to minimize minority voting strength." Shaw v. Barr,808 F.Supp. 461, 463-464 (E.D.N.C.1992)(quoting Letter from John R. Dunne, Assistant Attorney General of N. C., Civil Rights Div., to Tiare B. Smiley, Special Deputy Attorney General of N.C. 4 (Dec. 18, 1991)). The DOJ likewise pressured Louisiana to create a new majority-black district when the State sought approval of its congressional redistricting plan following the 1990 Census. See Hays v. Louisiana,839 F.Supp. 1188, 1190 (W.D.La.1993), vacated on other grounds by Louisiana *1285 v. Hays,512 U.S. 1230, 114 S.Ct. 2731, 129 L.Ed.2d 853 (1994).
Although we eventually rejected the DOJ's max-black policy, see Miller, supra,at 924-927, 115 S.Ct. 2475, much damage to the States' congressional and legislative district maps had already been done. In those States that had enacted districting plans in accordance with the DOJ's max-black policy, the prohibition on retrogression under § 5 meant that the legislatures were effectively required to maintain those max-black plans during any subsequent redistricting. That is what happened in Alabama.
B
Alabama's 2010 redistricting plans were modeled after max-black-inspired plans that the State put in place in the 1990's under the DOJ's max-black policy. See generally Kelley v. Bennett,96 F.Supp.2d 1301 (M.D.Ala.2000), vacated on other grounds by Sinkfield v. Kelley,531 U.S. 28, 121 S.Ct. 446, 148 L.Ed.2d 329 (2000)(per curiam).
Following the 1990 Census, the Alabama Legislature began redrawing its state legislative districts. After several proposals failed in the legislature, a group of plaintiffs sued, and the State entered into a consent decree agreeing to use the "Reed-Buskey" plan. 96 F.Supp.2d, at 1309. The primary designer of this plan was Dr. Joe Reed, the current chairman of appellant Alabama Democratic Conference. According to Dr. Reed, the previous plan from the 1980's was not "fair" because it did not achieve the number of "black-preferred" representatives that was proportionate to the percentage of blacks in the population. Id.,at 1310. And because of the DOJ's max-black policy, "it was widely assumed that a state could (and, according to DOJ, had to) draw district lines with the primary intent of maximizing election of black officials." Id.,at 1310, n. 14. "Dr. Reed thus set out to maximize the number of black representatives and senators elected to the legislature by maximizing the number of black-majority districts."Id., at 1310.Illustrating this strategy, Alabama's letter to the DOJ seeking preclearance of the Reed-Buskey plan "emphasize[d] the Plan's deliberate creation of enough majority-black districts to assure nearly proportional representation in the legislature," ibid.,n. 14 and boasted that the plan had created four new majority-black districts and two additional majority-black Senate districts. Ibid.
Dr. Reed populated these districts with a percentage of black residents that achieved an optimal middle ground-a "happy medium"-between too many and too few. Id.,at 1311. Twenty-three of the twenty-seven majority-black House districts were between 60% and 70% black under Reed's plan, id.,at 1311, and Senate District 26-one of the districts at issue today-was pushed from 65% to 70% black. Id.,at 1315.[3]A District Court struck down several districts created in the Reed-Buskey plan as unconstitutionally based on race. Id.,at 1324. This Court reversed, however, holding that the plaintiffs lacked standing because they did not *1286 live in the gerrymandered districts. Sinkfield, supra,at 30-31, 121 S.Ct. 446.
The Reed-Buskey plan thus went into effect and provided the template for the State's next redistricting efforts in 2001. See Montiel v. Davis,215 F.Supp.2d 1279, 1282 (S.D.Ala.2002). The 2001 maps maintained the same number of majority-black districts as the Reed-Buskey plan had created: 27 House districts and 8 Senate districts. Ibid. And "to maintain the same relative percentages of black voters in those districts," the legislature "redrew the districts by shifting more black voters into the majority-black districts." App. to Juris. Statement 4. The State's letters requesting preclearance of the 2001 plans boasted that the maps maintained the same number of majority-black districts and the same (or higher) percentages of black voters within those districts, other than "slight reductions" that were "necessary to satisfy other legitimate, nondiscriminatory redistricting considerations." Letter from William H. Pryor, Alabama Attorney General, to Voting Section Chief, Civil Rights Division, Department of Justice 6-7 (Aug. 14, 2001) (Senate districts); Letter from William H. Pryor, Alabama Attorney General, to Voting Section Chief, Civil Rights Division, Department of Justice 7, 9 (Sept. 4, 2001) (House districts).
Section 5 tied the State to those districts: Under this Court's § 5 precedents, States are prohibited from enacting a redistricting plan that "would lead to a retrogression in the position of racial minorities." Beer v. United States,425 U.S. 130, 141, 96 S.Ct. 1357, 47 L.Ed.2d 629 (1976). In other words, the State could not retrogress from the previous plan if it wished to comply with § 5.
IV
Alabama's quandary as it attempted to redraw its legislative districts after 2010 was exacerbated by the 2006 amendments to § 5. Those amendments created an inflexible definition of "retrogression" that Alabama understandably took as requiring it to maintain the same percentages of minority voters in majority-minority districts. The amendments thus provide the last piece of the puzzle that explains why the State sought to maintain the same percentages of blacks in each majority-black district.
Congress passed the 2006 amendments in response to our attempt to define "retrogression" in Georgia v. Ashcroft,539 U.S. 461, 123 S.Ct. 2498, 156 L.Ed.2d 428. Prior to that decision, practically any reapportionment change could "be deemed 'retrogressive' under our vote dilution jurisprudence by a court inclined to find it so."Bossier I,520 U.S., at 490-491, 117 S.Ct. 1491(THOMAS, J., concurring). "[A] court could strike down anyreapportionment plan, either because it did not include enough majority-minority districts or because it did (and thereby diluted the minority vote in the remaining districts)." Id.,at 491, 117 S.Ct. 1491.Our § 5 jurisprudence thus "inevitably force[d] the courts to make political judgments regarding which type of apportionment best serves supposed minority interests-judgments courts are ill equipped to make." Id.,at 492, 117 S.Ct. 1491.
We tried to pull the courts and the DOJ away from making these sorts of judgments in Georgia v. Ashcroft, supra. Insofar as § 5 applies to the drawing of voting districts, we held that a District Court had wrongly rejected Georgia's reapportionment plan, and we adopted a retrogression standard that gave States flexibility in determining the percentage of black voters in each district. Id.,at 479-481, 123 S.Ct. 2498. As we explained, "a State may choose to create a certain number of 'safe' districts, in which it is highly *1287 likely that minority voters will be able to elect the candidate of their choice." Id.,at 480, 123 S.Ct. 2498. Alternatively, "a State may choose to create a greater number of districts in which it is likely-although perhaps not quite as likely as under the benchmark plan-that minority voters will be able to elect candidates of their choice." Ibid.We noted that "spreading out minority voters over a greater number of districts creates more districts in which minority voters may have the opportunity to elect a candidate of their choice," even if success is not guaranteed, and even if it diminished the chance of electing a representative in some districts. Id.,at 481, 123 S.Ct. 2498. Thus, States would be permitted to make judgments about how best to prevent retrogression in a minority group's voting power, including assessing the range of appropriate minority population percentages within each district. Id.,at 480-481, 123 S.Ct. 2498.
In response, Congress amended § 5 and effectively overruled Georgia v. Ashcroft. See 120 Stat. 577. The 2006 amendments added subsection (b), which provides:
"Any voting qualification or prerequisite to voting, or standard, practice or procedure with respect to voting that has the purpose or will have the effect of diminishing the ability of any citizens of the United States on account of race or color ... to elect their preferred candidates of choice denies or abridges the right to vote within the meaning of ... this section." 52 U.S.C. § 10304(b). See § 5, 120 Stat. 577.
Thus, any change that has the effect of "diminishing the ability" of a minority group to "elect their preferred candidate of choice" is retrogressive.
Some were rightly worried that the 2006 amendments would impose too much inflexibility on the States as they sought to comply with § 5. Richard Pildes, who argued on behalf of the Alabama Democratic Conference in these cases, testified in congressional hearings on the 2006 amendments. He explained that Georgia v. Ashcroft"recognizes room ... for some modest flexibility in Section 5," and warned that if "Congress overturns Georgia v. Ashcroft,it will make even this limited amount of flexibility illegal." Hearing on the Continuing Need for Section 5 Pre-Clearance before the Senate Committee on the Judiciary, 109th Congress, 2d Sess., pp. 11-12 (2006). Pildes also observed that the proposed standard of "no 'diminished ability to elect' ... has a rigidity and a mechanical quality that can lock into place minority districts in the south at populations that do not serve minority voters' interests."Id.,at 12. Although this testimony says nothing about how § 5 ought to be interpreted, it tells us that the Alabama Democratic Conference's own attorney believes that the State was subject to a "rigi[d]" and "mechanical" standard in determining the number of black voters that must be maintained in a majority-black district.
V
All of this history explains Alabama's circumstances when it attempted to redistrict after the 2010 Census. The legislature began with the max-black district maps that it inherited from the days of Reed-Buskey. Using these inherited maps, combined with population data from the 2010 Census, many of the State's majority-black House and Senate districts were between 60% and 70% black, and some were over 70%. App. to Juris. Statement 103-108. And the State was prohibited from drawing new districts that would "have the effect of diminishing the ability" of blacks "to elect their preferred candidates of choice." § 10304(b). The legislature *1288 thus adopted a policy of maintaining the same number of majority-black districts and roughly the same percentage of blacks within each of those districts. See ante,at 1270 - 1271.
The majority faults the State for taking this approach. I do not pretend that Alabama is blameless when it comes to its sordid history of racial politics. But, today the State is not the one that is culpable. Its redistricting effort was indeed tainted, but it was tainted by our voting rights jurisprudence and the uses to which the Voting Rights Act has been put. Long ago, the DOJ and special-interest groups like the ACLU hijacked the Act, and they have been using it ever since to achieve their vision of maximized black electoral strength, often at the expense of the voters they purport to help. States covered by § 5 have been whipsawed, first required to create "safe" majority-black districts, then told not to "diminis[h]" the ability to elect, and now told they have been too rigid in preventing any "diminishing" of the ability to elect. Ante,at 1271 - 1272.
Worse, the majority's solution to the appellants' gerrymandering claims requires States to analyze race even moreexhaustively, not less, by accounting for black voter registration and turnout statistics. Ante,at 1271 - 1272. The majority's command to analyze black voting patterns en route to adopting the "correct" racial quota does nothing to ease the conflict between our color-blind Constitution and the "consciously segregated districting system" the Court has required in the name of equality. Holder,512 U.S., at 907, 114 S.Ct. 2581. Although I dissent today on procedural grounds, I also continue to disagree with the Court's misguided and damaging jurisprudence.
Appendix A *1289 Appendix B
State's Use of Incorrect Retrogression Standard
The following citations reflect instances in either the District Court opinion or in the record showing that the State believed that § 5 forbids, not just substantialreductions, but anyreduction in the percentage of black inhabitants of a majority-minority district.
*1290 Appendix C

As I have previously explained, § 5 of the Voting Rights Act is unconstitutional. See Shelby County v. Holder,570 U.S. ----, ----, 133 S.Ct. 2612, 2631, 186 L.Ed.2d 651 (2013)(THOMAS, J., concurring). And § 5 no longer applies to Alabama after the Court's decision in Shelby County. See id.,at 2631(majority opinion). Because the appellants' claims are not properly before us, however, I express no opinion on whether compliance with § 5 was a compelling governmental purpose at the time of Alabama's 2012 redistricting, nor do I suggest that Alabama would necessarily prevail if appellants had properly raised district-specific claims.

The District Court found it "unclear whether DOJ's maximization policy was driven more by [the ACLU's] advocacy or DOJ's own misguided reading of the Voting Rights Act," and it concluded that the "considerable influence of ACLU advocacy on the voting rights decisions of the United States Attorney General is an embarrassment." Johnson v. Miller, 864 F.Supp. 1354, 1368 (S.D.Ga.1994).

In this litigation, Dr. Reed and the Alabama Democratic Conference argue that the percentage of black residents needed to maintain the ability to elect a black-preferred candidate is lower than it was in the 2000's because black participation has increased over the last decade. Brief for Appellants in No. 13-1138, pp. 39-40. Although appellants disclaim any argument that the State must achieve an optimal percentage of black voters in majority-black districts, id.,at 35, it is clear that that is what they seek: a plan that maximizes voting strength by maintaining "safe" majority-minority districts while also spreading black voters into other districts where they can influence elections. Id.,at 17-18.